Good morning, ladies and gentlemen. Our first case for argument today is Shakman v. Pritzker. Mr. Hemmer. Good morning. May it please the Court, Alex Hemmer for the Governor. The District Court's decision rests on its determination that continued judicial supervision is necessary to prevent hypothetical future violations of the Supreme Court's 1991 Rutan opinion, which prevents consideration of political factors in hiring. That decision is wrong for three reasons. First, it's wrong as a matter of law because the 1972 consent decree, the only agreement the state has ever signed in this case, expressly excludes hiring, an exclusion that prompted decades of litigation by the plaintiffs against other defendants. Second, the plaintiffs, as third party voters and political candidates, lack standing to what this court held in 1987 at the culmination of the litigation I just mentioned. Third, even if it were appropriate for these plaintiffs to use the 1972 decree to supervise state hiring, there is no evidence that the state is considering political factors in hiring today and no evidence that the state will rescind the many changes it has made to its hiring policies over the last decade absent judicial supervision. Each of these is an independent reason to vacate the District Court's decision, and taken together, they show why continued judicial oversight over state hiring under the banner of the 1972 decree is so problematic. Unless the Court has a contrary preference, I'll take up the interpretive question first and then turn to whether vacater is appropriate even under plaintiffs' view of the consent decree. Mr. Hemmer, are you arguing that the plaintiffs lack standing as a matter of Article III subject matter jurisdiction, or are you casting that more in terms of the Rule 60b-5 equitable factor? The argument is the latter, Your Honor. So this is the argument that the Court discusses in its 2005 opinions in Chackman 3 and 4. You know, it requires the District Court to look to whether plaintiffs would have standing under the contemporary Article III jurisprudence, but it's an equitable analysis for the Court. It doesn't go to the Court's subject matter jurisdiction. I'd like to turn back to the interpretive question, though. You know, the kind of core issue here, we think, is that the proceedings below rest on a misinterpretation of the 1972 decree, and this is an error of law that the Court reviews de novo. The 1972 decree expressly reserves the question for future litigation whether, quote, political sponsorship or other political considerations can be taken into account in hiring employees. That means there is no judgment entered and no agreement signed that could cover hiring, and the plaintiffs proceeded to litigate that question against certain defendants for over a decade. That litigation culminated in this Court's 1987 decision in Chackman 2, holding that plaintiffs lacked standing to challenge hiring practices. And importantly, that decision, the Chackman 2 decision, led the plaintiffs to make a number of deliberate changes to the litigation with respect to other defendants, but not with respect to the state. Between the mid-1980s and mid-1990s, new plaintiffs were added to the case who did have standing, as in the County Clerk Appeal, and new consent agreements were signed with all of the Cook County defendants against whom plaintiffs were actively litigating, again, as in the County Clerk Appeal. But plaintiffs did not make these changes to the litigation against the state, which remains subject only to the 1972 decree. And neither the plaintiffs nor the District Court have ever offered a satisfactory explanation as to why it is appropriate to use the 1972 decree, which excludes hiring, to oversee all aspects of state hiring. The best anyone can do is to point to Section E1 of the decree, which contains a very general prohibition against politically motivated conduct. But it's a basic rule of contract interpretation that the specific controls the general, not vice versa. And reading the general language of Section E1 to override the specific language of Section H1B effectively reads the hiring exclusion out of the consent decree altogether, because every hiring decision could conceivably affect a current employee. That interpretation of the decree can't be right. If it were right, the decade or more that plaintiffs spent litigating the hiring question would have been unnecessary. The public employee plaintiffs that were added to the case against other defendants would have been unnecessary. The additional consent decrees that the plaintiffs negotiated with those defendants in the 80s and 90s would have been unnecessary, because the 1972 decree would have given plaintiffs everything they wanted already. That interpretive issue resolves this case at the same time. If the plaintiffs are asked correctly not to apply to hiring, then the proceedings below have no foundation. That's because there's no allegation at all that the state is violating the 1972 decree in any way that does not relate to hiring. The motion should have been granted on that basis alone. But even if the decree is read as plaintiffs and the district court have, the motion should still have been granted, because the state is in compliance with even that broader reading of the Supreme Court's decision to rescind the many policy changes it's made over the last decade, absent judicial supervision. First, the state is in substantial compliance with the 1972 decree. The Supreme Court's decision in Horn against Flores explains that continued oversight is only proper if there is evidence of, quote, ongoing violations of federal law. What's more, to impose a system-wide violation of Rutan, the special master has overseen the state for seven years and filed 21 reports with the court. In that time, she has not only identified no system-wide violations of Rutan since the IDOT issue, she has not identified any recent documented violations of any federal law. Now, the plaintiffs have no real response. They say that the state bears the burden to attest that it's in compliance by means of some kind of affidavit, but the plaintiffs themselves have repeatedly stated that it's the special master who will supply the up-to-date facts required by Horn. They said that in the motion for her appointment in 2014, they said that in the motion to expand her authority last year, and they said that most recently in their response to the state's motion to vacate. They can't turn around now and take a contrary position just because they don't like the record she has compiled. Plaintiffs also identify a grab bag of what they call, quote, compliance problems, and the district court relied on those too. I'm happy to discuss any of these individually, but none are evidence of actual violation of Rutan or any other federal law. Many date to before the special master's appointment. Others are simply allegations, allegations that in some cases the state has investigated and determined are not supported by evidence, and the rest are simply failures by state employees to follow procedures, not failures to follow federal law. Even if you're right about that, isn't the district court's broader reasoning that, look, there are a lot of yellow lights flashing. There's a fair bit of smoke in different directions. We're in Illinois. You know, we have, there is a really unfortunate and sad history of patronage hiring. You don't get to see the IDOT scandal that you talked about. And so against that backdrop, why is it an abuse of discretion to leave the decree in place? So, you know, to kind of get at the last part first. So I guess the question, Mr. Hemmer, is yeah, yeah, yeah, you may be right on the kind of technical violations point, but what about the flashing yellow lights and the smoke and all that? Well, so I want to get at the last part of your question first, which is the kind of abuse of discretion standard. And, you know, there's no dispute that it's abuse of discretion to kind of apply the wrong legal standard to the facts before the court, and that's what we think Judge Chang did here. The standard is from Florence against Flores, and it says that a court considering a termination motion has to begin with the question of whether there are ongoing violations of federal law. The court here didn't genuinely ask that question, and it's clear from the record that there aren't. If the court's, you know, kind of proceeding to the second question, which is whether there's a durable remedy in place, every court of appeals has read that reference in Horn to require, you know, essentially an inquiry into whether if you took the consent decree away, if you took judicial oversight away, would things backslide? You know, would there be, with the kind of ongoing violations that the state has here eradicated kind of the court below, Judge Chang didn't ask that question either. So we think the decision below really rests on those kind of errors of law, and the court doesn't need to kind of go further and start wading into the facts. But with respect, you know, Judge Scudder, I'd also say that there isn't a kind of Illinois exception to Horn against Flores, you know, and Horn says pretty clearly that you can't sustain a consent decree on the basis of things that happen, doesn't use these language, but a lot of people have asked about the IDOT issue, but the IDOT abuses, even the OEIG, you know, report suggests ended no later than, you know, 2012-2013. That's almost a decade since that occurred, and it's simply not possible, it's not justifiable to kind of continue to impose the consent decree on the state for abuses that occurred almost a decade ago. So you would surely agree, wouldn't you, that if the plaintiff believes that she or he experienced a violation, they can bring the lawsuit and presumably bring a new claim, Rutan or Brantee, whatever, wherever it falls, and presumably, if that claim were sustained in fashioning injunctive relief, the recidivism could be considered too, couldn't it? Absolutely, Judge Scudder. So it's certainly true that a plaintiff who actually had a Rutan claim, you know, a public employee or someone who wanted to be a public employee, could bring suit even if the consent decree were abated. So you're just urging us, look, get out of the systemic, you know, decree monitoring and let's turn it back to case-by-case resolution? That's exactly right, Judge Scudder. I mean, you know, what we have here is, you know, in lieu of the kind of ordinary system that we envision for kind of people bringing cases to the court, we have essentially a kind of, you know, shadow inspector general that's been set up and that continues under the banner of the 1972 decree. And that's just not warranted by the facts any longer. And, you know, the Horne court kind of talks about this, and this court talked about it in the county clerk appeal, you know, there is a real intrusion on the state's management of its day-to-day affairs here. And there is no evidence, you know, that intrusion has to be justified by the facts on the ground. And nothing in the facts as relayed by the special master continues to justify that kind of intrusion here. I do want to briefly discuss standing. I know my, you know, clock's winding down. There's really, there can be no real dispute, I think, that plaintiffs lack standing to bring hiring claims against the state. That's what this court held in 1987 when the same plaintiffs tried to bring essentially the same claims against a group of Cook County defendants. You know, I'm happy to address plaintiff's arguments about why that decision doesn't control here, but I think it's hard to see a court today accepting plaintiff's standing arguments under contemporary standing jurisprudence. Plaintiffs aren't public employees. They haven't applied to be public employees. They don't want to be public employees. They have an interest in preventing corruption and ensuring good government. And we're not here to dispute the sincerity of that interest. But contemporary standing jurisprudence doesn't allow third party plaintiffs like this to serve in the kind of ombudsman role that they've assumed. Now, the important point here is that the district court was presented with this argument and essentially declined to resolve it. The court kind of goes through the party's arguments, but rather than resolve them, it sort of pronounces sua sponte that any issue on this front can be resolved by, quote, maintaining a laser focus on the First Amendment rights of public employees. That is, non-parties to the lawsuit who can't assert their own rights in these proceedings. And the plaintiffs don't really defend that approach here, and I think rightly so. I mean, a court can't cure a standing defect by hypothesizing what it might have standing would want. This court made clear in both of its 2005 opinions that a lack of standing can constitute an equitable defect that entitles the party to vacater. And that's what the state has argued here. I think that defect really exacerbates, really sort of brings into focus the problems with the proceedings as they are ongoing below. You have this very intrusive oversight mechanism that involves the active monitoring of hiring at agencies across the state's 50,000 jobs, conducted under the ambit of a consent decree that with no evidence at all of ongoing violations of federal law on the state's part, overseen by plaintiffs who lack any concrete stake in the outcome. The result is a kind of perfect storm from a federalism and separation of powers perspective. Unless the court has questions, I'm happy to reserve the remaining, you know, six minutes of my time and get back up after you have a chance to talk to my counterparts. Certainly, Mr. Hammer. Mr. Hayes. Good morning, Your Honor. My name is Brian Hayes. I'm here on behalf of the class plaintiffs. The controlling issue in this appeal is whether the district court abused his discretion in finding that the state failed to meet its evidentiary burden that the state has complied with the 1972 consent decree and implemented a durable remedy as required under Dowell, Rufo, and Horn. Unless that ruling is so wrong that no reasonable judge could have made it, this court should affirm. Under Dowell, Rufo, and Horn, a party moving to vacate a decree under Rule 60b-5 must show both that the decree's objects have been attained and that it is unlikely that the absence of the decree, in the absence of the decree, that the unlawful acts will reoccur. In Horn, they summarize that as whether the defendant has implemented a durable remedy. Mr. Hayes, I have a question about the state of the record. Does the record show that Illinois is violating Elrod or Rutan more often than other states not subject to decrees of this kind? Well, Your Honor, that's not something that either side has looked at. One needs to figure out what the decree is doing. I understand an argument to keep in place a decree that is successful at preventing constitutional violations, but the only way to measure success, it seems to me, is to compare what's happening in Illinois with what's happening in Indiana or Wisconsin or South Dakota. And if there's no effort to make that comparison, I don't see how one can see that the decree is doing anything. Well, respectfully, Your Honor, the burden under the various cases under Rule 60b-5 would be for the state to present that evidence. Yes, lawyers love to play burden-shifting games. All lawyers hope that their opponent will bear all interesting burdens. But I take it your answer is the record shows absolutely nothing about this. Now, suppose we go outside the record and look at the academic literature, which there's, I think, a reasonable amount. Is there any clue in the academic literature that Illinois is doing worse at these things than other states not under consent decrees? Again, Your Honor, that was not a factual issue that was raised below. It was a matter of remand. The state does currently have a motion to vacate pending, a renewed motion to vacate. They, again, did not raise that argument, so we hadn't planned on addressing it, but we certainly can, with the understanding that it is something of interest to Your Honor. The issue, though, that's before this Court is primarily whether or not the state has implemented a durable remedy. There was no question in 2014 that there were systemic and widespread violations that had gone back for decades. The state had readily admitted to that, and we cite to, and quote, the multiple times when the state admitted to the widespread, decade-long political patronage that had been going on. Well, you describe that as violations, but this was long before Elrod against Burns, and obviously before Rutan. Rutan reversed an en banc decision of this Court. It's very hard to describe as intentional violations of law activities that had never been declared to be unlawful. I'm talking about recent, Your Honor, from 2003 to 2014. Those are the decades where the state had been violating. So that's all post-Elrod, post-Bronte, post-Rutan, where the state continued to violate the 1972 consent decree. And I just want to make this clear as well, because the argument that the state spent much of its time on was the scope of the decree. I want to be clear. We are not challenging, in this case against the state, external hiring. The 1972 decree does not cover external hiring. But what it does cover, and the plain language of the decree makes that clear, it covers internal promotions, it covers transfers, it covers reassignments. Can I ask you a question? It may seem a little technical, but even if you're right about that, as we sit here today, under the modification of the special master's charge, as a result of the district court opinion, isn't the special master looking after the governor's compliance with the employment plan, the so-called CEP? Yes, but she's only been doing that for a year now. Okay. And if the special master's charge is to look after compliance with the comprehensive employment plan, doesn't the comprehensive employment plan, by its terms, include procedures related to external hiring? Well, that was a decision that the governor made, instead of having a promotion policy and a separate external hiring? Well, maybe, but that could be. I mean, it's the governor's plan, so presumably he made it. But my only point is that the special master's charge, mission, mandate, right now, includes assessing compliance with the plan, and the plan, by its terms, includes external hiring, provisions, protocols, and the like. Doesn't that de facto kind of expand the decree? No, Your Honor. The special master's reports have made clear she has been focused on the internal hiring, the promotions. Well, but presumably the special master's going to follow the direction of the district court and not disregard it. In other words, maybe I'm mistaken, and you can tell me I am. I'm willing to believe that. But the way that I read the district court opinion is that plan compliance is now part of the special master's mission. That is correct. But again, likely, the special master's found that roughly 90% of the, quote, hiring that goes on are really promotions. It's internal people. It's not open to the external world. Or even if it's open to the external world, it's also open to internal candidates to bid for and to be interviewed for. Well, the whole IDOT scandal started with external hiring, did it not? Yes, and we did not challenge, and the violation wasn't that they hired people, external people, into allegedly root-hand-exempt positions. What we challenged and what the district court found was that once those people were improperly put into a root-hand-exempt position, they were then immediately transferred, reassigned, or promoted into Shackman or root-hand-covered positions without going through the competitive process. So it was the transfer, reassignment, and promotion that was the subject of our challenge, and those are all clearly covered by the 72 decree. Can I ask you a broader question? There's this back and forth between the parties. I think it's healthy. You've both done a very good job at it, in my view, on the standing issue. But I have a broader question, and that is, are you certain that we have a case or controversy here within the meaning of Article III? Yes, Your Honor. Why? Mr. Shackman represents a class, a certified class, of candidates for public office, and the candidates have standing to challenge this type of behavior, and that's what this court found in Shackman 1. Going back to the court, the court found in Shackman 1 that the interests of candidates in official treatment free from intentional or purposeful discrimination are entitled to constitutional protection. And Shackman 2, Shackman 3, Shackman 4, Shackman 6 have all made clear that Shackman 1 has never been overturned. It is still the law of the land. And the standing and the injury that goes to— the consent decree's longevity can extend so far that you just cease to have a case or controversy. In other words, if we understand a case or controversy, as the Supreme Court has explained, to be a concrete dispute between adverse parties, it'd be really useful to me to hear you address, how does this fit within that understanding? It just seems like it keeps drifting. And now it's drifted into a special master being charged with monitoring the governor's compliance with an employment plan across all department—I don't know what the right language is—all offices within his jurisdiction. That's broader than the decree. It just is. I mean, it's all employment. And I know you can say, well, there's 90 percent that are internal transfers, but that still means there's 10 percent of external hiring. Well, again, on remand below, we can clarify that the special master should not look at external hiring. That would be—I don't believe that she has. That's not been her focus. But to address your question, a federal court order, when it's in place, must be obeyed until it's vacated. And under Rule 60B, the state had the affirmative obligation to come in and say, we've complied with the 72 decree. We've implemented a durable remedy. Here's how we're doing that. The court would have then had findings of fact and would have ruled on whether or not it should have been vacated. What the record shows— What did the governor need to come forward with, in your view? Can you give me a couple of examples of evidence that may have sufficed? Certainly. The examples are the city of Chicago, Cook County. The Cook County Forest Preserve District. The sheriff of Cook County. The Chicago Park District. All the folks that have been—or groups that have been relieved. Correct. They came forward and they presented that they had—one, that they were complying and that there was no recent evidence of violating the decrees. And they showed that they had implemented—actually implemented—and that's what all the cases look at. They've actually implemented their employment plans and hiring plans and such. And so they had a long record of hiring people, following the plan. The special master reported on that. In the case of the Park District, we didn't have a special master. We relied on their internal inspector general who presented evidence that the employment plan was, in fact, being followed. And it's not perfection. If people made mistakes, it was caught. It was called out. It was remedied. And that is when the court was able to say, you've got this. You can self-police. You've got the policies and procedures. The guardrail's in place. Because we know, as Your Honor pointed out, in Illinois, there are going to be politicians that are going to always try and pressure officials to hire their people in order to get them to work on their campaigns. What these policies and procedures—in this case, for the state, the comprehensive employment plan—what it does is it puts in these checks, checkpoints, benchmarks, so that it makes it much harder for somebody to manipulate the system. And if somebody does try to implement it, it has the compliance mechanism. It has an investigation mechanism in order to report that. The problem that we have here is that it hasn't been implemented. I must say, you may be answering Judge Scudder's question, but the nature of your answer causes me to worry that we lack a case or controversy, even if the plaintiffs or class members of the plaintiffs have standing. Because as you describe what's going on, there is just a judicial superintendent to prevent constitutional violations. That doesn't sound like a case or controversy. First, you have to have an asserted violation, and then you have a case or controversy. Respectfully, Your Honor, that's not how it works. We have a case or controversy. There are candidates who will be prejudiced by unlawful political patronage. We have evidence of unlawful political patronage. We don't know that. What you describe this decree and the special master is doing is working to prevent that, to prevent a case or controversy from arising. That's what we're trying to do, but it hasn't happened yet. Exactly, but that's my problem. You had patronage hiring back in the 60s and 70s. And 80s and 90s and 2000s and 2010s. But you need a controversy now, a real case or controversy. That's what I'm missing. Respectfully, Your Honor, the case or controversy in 2014 when the monitor was appointed was that we had a class of independent candidates that are harmed by political patronage. And we had widespread evidence of political patronage. So we had a case or controversy. Those candidates in our class were being harmed. They were forced to, as we alleged in the original complaint, they had to spend their personal money or campaign money. They had to divert resources in order to combat the patronage workers that were out there campaigning against them. And this is 2014 we're talking about. We're not talking about just 1969. I think your emphasis on 2014 is fair. I do, okay? But at this point in time where the reason I'm asking the question, I don't know if Judge Easterbrook is or what his reason is for it, but I think on the case or controversy point, I think 2014 is not yesterday. It's not an eternity ago either. I mean, in fairness to your position there. But at this point, what the special master is doing with the oversight of a federal judge is working to minimize risk. I don't know what, and at some point, that risk is going to get low enough that you're satisfied that it can be vacated. Respectfully, Your Honor, we would look at it differently. What the special master is doing is monitoring the state, implementing their agreed-upon durable remedy. What we have here, and this is important, I think the timeline of events. That's my whole problem. The idea that monitoring is a real case or controversy kind of confuses the judiciary with the Federal Trade Commission. The Federal Trade Commission monitors, but it's an Article I agency. Nobody would think the Federal Trade Commission's job is suitable for an Article III judge. And that seems to be your point here. The monitor is part of the remedy. It is not the case or controversy. The case or controversy is the unlawful political patronage. It's not the monitor. In any institution of informed litigation, there's a period where the issues and facts are litigated. There is a judgment and an attorney for an agreement. The remedy has to be solving the violation. It can't be a freestanding monitor. The remedy is the comprehensive employment plan. That's the remedy. That's what they agreed to in January of 2019. They said, yes, you had all these violations. We engaged in extensive negotiations. And the record reflects we started in 2014 to continue negotiations. Suppose there were a consent decree that said, we don't think the Federal Trade Commission is doing its job. A district judge is now empowered by consent of the president to do the job of the Federal Trade Commission, including monitoring commerce and ordering such remedies as are appropriate. Would one say that was within the scope of Article III? Likely not. But that's not what's happening here, Your Honor, respectfully. For all you are arguing, that is what's happening here. Your Honor, if I use the example, a comparison of, say, a school desegregation case. So there's a litigation, a trial, there's a finding that the schools are segregated. There now has to be a period of implementing the remedy in order for that to end. And it's not going to happen overnight. They're not going to go from 100% white and 100% African-American schools to 50-50 to the next day. We're in this now for 53 years, and your argument is it will continue into the indefinite future. No, Your Honor. It leads people like me to wonder whether the state has a Republican form of government. No, Your Honor. The sunset of this decree is on the very near horizon. It's a matter of months. The district court, starting in March of this year, took this court's decision in the case against the county clerk very seriously. He has set very aggressive schedules. He's very hands-on. So why isn't it good enough then for you to accept the representation of the government, of the governor, I'm sorry, that all of the reforms, all of the remedial measures will be continued? And then, if there is a particular individual, an employee or a prospective employee that believes her constitutional rights were violated, that she should go bring a case, bring a new case, and ask for a stiff remedy, mindful of the recidivism, why isn't that enough at this point? Because... Case-by-case adjudication of concrete adversarial disputes. Well, the history of this case is that promises have not been followed through, and that's why we're still here. So that's why I don't know how you can say that you're... I don't know where your confidence comes from that we're months away. Because they have, they finally, in January of, or in November of 2019, the state finally filed their comprehensive employment plan that governs their promotions, transfers, temporary assignments, all of those things. So they now have a written policy that has a compliance element. It has an investigative element. All of this being done by the state, not by the monitor. The problem is that when the governor's motion was premature, he admitted that he had not even started to train on the comprehensive employment plan until September of 2020, which was three months after he filed the motion to vacate. If the, if Rue and Horne, if Rue, Horne, and Dow mean anything, is that they have to actually implement the remedy. And that's the problem. They never implemented a remedy that would stop unlawful political patronage. That was a problem with the other defendants. And what we've seen in the history of this case, again, recently, makes clear that with the help of a special master, the defendants are able to put in place, to implement, to monitor internally, to enforce, and to have accountability that has led to meaningful... When do they indicate it will be implemented? They have, they have been trying to implement it. And that's what's gonna be addressed by the district court, and there'll be up-to-date findings of fact based on the actual implementation. They did not start implementing the plan until September of 2020, when they finally did their, began training. And that was after they filed this motion to vacate. The appropriate remedy here, Your Honor, is to affirm the lower court's decision based on the facts that existed at that time, not facts that exist today, and remand it to the district court to make the up-to-date factual determination to decide whether or not the state has actually implemented the remedy that they agreed in 2019 that they would implement in order to solve the widespread patronage violations. The monitor is just there to make sure that the state is actually doing it. It is the state that wrote these policies. It is the state that is responsible through their hiring and enforcement monitor for monitoring it. It is the state that's responsible for investigating through the Office of the Inspector General. The problem is, when they filed this motion, they hadn't done any of those things. They hadn't actually implemented it. It was on paper, but it wasn't being done. And that's what the district court is looking at or will be looking at in the coming months, is have they actually implemented? And if we were to just say, well, they promised, they said they were going to do this, they never did, but we'll just throw it back and let new people file lawsuits, that would read out of Dowell, read out of Horn, the whole concept that they have to actually implement the remedy to make sure, or at least make it less likely, that this will reoccur. This case is not going to go on forever, Your Honor. Thank you, Mr. Hayes. Anything further, Mr. Hammer? A couple quick points, Your Honor. If you don't mind. I want to touch first on standing. So my colleague has conceded, I think, that the purpose of the special master is, in the court's words, to prevent a case or controversy from arising. That can't be good enough. I mean, that's just, as Judge Scudder observed, not the way that our judicial system is supposed to function. And the court is certainly, you know, has the power to say, look, there just isn't, there is no longer a case or controversy here, if that's what the court concludes. I want to address this discussion about the Comprehensive Employment Plan. So my colleague said repeatedly that the Comprehensive Employment Plan is... Have you ever asked for the class to be decertified? We haven't, Your Honor. It sounds like part of your argument might be better cast as the assertion that the named representatives are not members of the class. And therefore, they can't represent this class. That is a, that is a, I think a helpful observation, Your Honor. I mean, what we did argue below is that there is a class of individuals who might be impacted by the state's hiring policies, and that class is... But the representatives have to be members of the class they represent. That's a fundamental principle. Absolutely, Your Honor. And here, the class that's certified isn't even a class of employees or would-be employees. It's a class of political candidates and voters. So it's not just that... But, to get back to my question, your answer is no. We have not... It's not been requested. That's correct. Okay. I do want to talk briefly about the CEP. So, my colleague repeatedly described the CEP as the agreed-upon durable remedy, but that is simply not the case. The, the plaintiffs are, I think, confusing our case with some of the other proceedings against other Shackman defendants. In those, in some of those cases, the institution of, of a comprehensive employment plan was part of an agreed-upon supplemental relief order entered by the court. Here,  of, of establishing a comprehensive employment plan is something that the state and the plaintiffs discussed in 2019 and that, of course, the state has made significant progress on during that time. But it is not and has never been part of what the state believes is the durable remedy in this case. This, these proceedings were kind of reinvigorated to combat the abuses at IDOT and the agreed-upon sort of understood end point in 2014 and in 2017 when the special master's duties were expanded was the creation of a finite exempt list, a list of positions that were exempt from Rutan. That remedy would, the parties agreed and as the special master, you know, stated over and over again, address the IDOT issues by ensuring that the government couldn't do what it did in 2010 and, and before. That exempt list has been done, right? For years, Your Honor. So here, so am I, Mr. Hammer, is my understanding of the, the scope of the employment plan accurate or inaccurate? It is accurate, Your Honor. And, you know, what I would say is that the comprehensive employment plan is another example of the state being sort of penalized for taking voluntary steps to improve state hiring. The same is true of the state's move to an electronic hiring system, which again is not, And under the, and under the district court's order that we're reviewing, am I also right that the special master is now charged with monitoring compliance with the entirety of the plan? That is, that is correct. I mean, you know, there's a, there's a nuance which is she has more kind of investigative authority at some agencies than others. She's agreed to kind of look at a sample of, you know, of hiring sequences at a sample of agencies. But yes, her authority is to oversee the entirety of the CEP statewide. And as you and Mr. Hayes discussed, you know, the plaintiffs have tried to kind of justify this on the idea that a lot of hiring occurs internally and that, that internal hiring is sort of in scope, whereas external hiring is out of scope. There are a lot of issues with that argument. The first is that there is nothing in the consent decree that distinguishes internal hiring from external hiring. And as we discussed in the reply brief, the plaintiff's own statements in the 1987 Chackman II appeal made clear that they understood at that time that hiring was hiring, whether the people who were being brought in, whether the people who were being considered are external candidates or internal candidates. So all hiring is excluded from the judgment obtained in 1972, not just external hiring. And even if that weren't the case, as you discussed with Mr. Hayes, there is no differentiation at the moment between internal hiring and external hiring in the proceedings below, nor could there reasonably be because most hiring, as Mr. Hayes suggested, includes at least some internal candidates. So if it's the case that internal hiring is in scope and external hiring is out of scope, then you've essentially erased the hiring exclusion altogether. That isn't consistent with the decree's text, it isn't consistent with the 1987 appeal, and it is not a remotely practical distinction to make. The only other thing I'd say, Your Honor, is the plaintiffs talk a little bit about the pending motion before Judge Chang right now. Of course, that motion takes for granted every point that we've discussed today. It takes for granted that plaintiffs have standing. Is that a renewed motion to vacate? It is a renewed motion to vacate, that's right. So, you know, all of that is kind of water under the bridge, and if the court disagrees with the district court's resolution of any of those issues, then the appropriate course is to vacate the decision below and remand for further proceedings, and to do so, you know, ideally while that motion is still pending so that we don't have to continue to, you know, debate the finer points of the comprehensive employment plan. With that, we'd ask that the court vacate the decision below. Thanks. Thank you very much. Thanks to both counsel. The case is taken under advisement.